IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| K.P. and L.M. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | |
| LONE JACK C-6 SCHOOL DISTRICT, | ) | JURY TRIAL DEMANDED |
| DR. MATTHEW TARWATER, | ) | |
| KATHY BUTLER and KELLIE ROTH, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

COME NOW Plaintiffs K.P. and L.M. ("Plaintiffs"), by and through undersigned counsel,

and for their Complaint against Defendants Lone Jack C-6 School District, Dr. Matthew Tarwater,

Kathy Butler and Kellie Roth, state and allege as follows:

## INTRODUCTION

1.      As set forth in a separate complaint filed by S.L., the School District's former

Superintendent Dr. Matthew Tarwater is a sexual predator who serially preyed on female students.

After S.L. graduated from Lone Jack High School, Tarwater targeted K.P. to be his next victim.

The predatory tactics Tarwater employed to manipulate K.P. followed the same pattern as those

he employed to manipulate S.L., but his improper conduct was even more brazen as a result of the

complicity of School Board President Kellie Roth and High School Principal Kathy Butler.  Even

in the face of multiple complaints, Ms. Roth and Ms. Butler failed to investigate or take remedial

action to stop Tarwater's misconduct.  Instead, Ms. Roth and Ms. Butler actively assisted Tarwater

in covering up his misconduct, including by tipping him off to complaints, which emboldened

Tarwater and enabled him further to manipulate K.P. and to intimidate and retaliate against K.P.'s

mother L.M. and her brother E.M.  The complicity of Roth and Butler is further demonstrated by their conduct in permitting Tarwater quietly to resign.  Upon information and belief, Tarwater has already begun applying for jobs at other school districts in the Kansas City area.

## JURISDICTION AND VENUE

2.      Plaintiffs bring this action to redress a hostile educational environment pursuant to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) ("Title IX"), to redress the deprivation of constitutional rights under the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution pursuant to 42 U.S.C. § 1983.

3.      This Court has original jurisdiction of the federal questions presented herein pursuant to 28 U.S.C. §§ 1331, which confers on district courts subject matter jurisdiction over all civil actions arising under the Constitution, laws, and treaties of the United States.

4.      This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1343, which gives district courts original jurisdiction over:  (a) any civil action authorized by law to be brought by any person to redress the deprivation, under color of any state law, statute, ordinance, regulation, custom, or usage, of any right, privilege, or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; and (b) any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of the civil rights.

5.       Plaintiffs further assert causes of action under Missouri law over which the Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a), because Plaintiffs' causes of action under Missouri law are so related to the federal questions over which this Court has original jurisdiction as to constitute the same cause of controversy.

2

6.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), since all Defendants reside or resided in this district and the events giving rise to the claims occurred in this district.

## THE PARTIES

7.      Plaintiff K.P. is an adult resident of Cass County, Missouri.

8.      Plaintiff L.M. is K.P.'s mother and a resident of Cass County, Missouri. In addition, L.M. is and was at all relevant times employed by the School District as a teacher at the Lone Jack Elementary School.

9.      Defendant Lone Jack C-6 School District ("School District" or "LJSD") is and was at all relevant times a public school district located in Jackson County, Missouri, within the geographic areas encompassed by the Western District of Missouri.

10.      Defendant Dr. Matthew Tarwater ("Tarwater") was the Superintendent for LJSD. At all relevant times, Tarwater's actions as alleged herein were taken under color of state law and within the course and scope of his employment. He is sued in his individual and official capacities.

11.      Defendant Kathy Butler ("Butler") was the Principal of Lone Jack High School ("LJHS"). Before 2017, Butler served as principal of the elementary school and was L.M.'s direct supervisor. Her actions as alleged herein were taken under color of state law and within the course and scope of her employment. She is sued in her individual and official capacities.

12.      Defendant Kellie Roth ("Roth") is and was at all relevant times the President of the LJSD School Board. Her actions as alleged herein were taken under color of state law. She is sued in her individual and official capacities.

13.      Before being hired by LJSD, Defendant Matthew Tarwater was employed by the Harrisonville R-9 School District as a middle school history teacher from 2006 through 2012. For

3

the years 2007 through 2012, Tarwater also coached Eighth Grade girls' basketball. For reasons not apparent, Harrisonville R-9 School District accepted Tarwater's resignation in or about December 2012.[1] This was unusual because teacher contracts are typically renewed annually for a full year term. After being released by Harrisonville, LJSD hired Tarwater to be its high school principal. This was also unusual because, upon information and belief, Tarwater was relatively young and had no prior administrative experience.

14.     Following the events detailed below, LJSD accepted Tarwater's resignation in or about December 2019. Upon information and belief, LJSD provided Tarwater a 7-day option to resign in lieu of being fired as a result of K.P.'s and others' allegations about Tarwater's emotional, psychological and sexual abuse of female students. The District purports to have completed an independent investigation of the allegations in December 2019, but refuses to share its investigator's report or findings with Plaintiffs despite promising an "outcome letter" would be issued after the School Board's regular January 13, 2020 meeting. The District also refuses without explanation to ensure it will report to any potential future school employer that Tarwater's departure was a result of allegations of sexual misconduct.

## FACTS COMMON TO ALL COUNTS

15.     In the fall 2015, K.P. began her freshman year at LJHS. She was 15 years old.

---

1. Under Missouri law, Tarwater had gained permanent teacher status (i.e., tenure) prior to his last year at Harrisonville. See Mo. Rev. Stat. §168.104. Minutes of a December 20, 2011 closed meeting of the Harrisonville School Board indicate the School Board accepted Tarwater's resignation and approved a separation agreement which further required Tarwater to pay a penalty assessment of $6,000. Upon information and belief, the penalty was assessed under Harrisonville School Board Policy GCPB, which provides: "Because the district will incur substantial expense in seeking replacements, any certified personnel under contract . . . [o]n all resignations submitted on or after August 1 for the current contract year, such resignation shall be accompanied by $6,000 in check or good funds."

4

16.     At the time, Defendant Tarwater was the principal of LJHS, Defendant Kathy Butler was principal of the elementary school, and Defendant Kellie Roth was President of the School Board. The then-Superintendent for LJSD was Bryan Prewitt ("Prewitt").

17.     When K.P. began attending LJHS, Tarwater was already engaged in a years-long predatory sexual grooming of at least one former female LJHS student named S.L., who had graduated in the spring of 2015.[2]

18.     At or near the time when K.P. began attending LJHS, the School District had received at least one prior complaint by a female student and/or her family regarding violation of Title IX and which involved allegations of sexual misconduct and acts or omissions by Tarwater and Prewitt, including but not limited to a threat of litigation. Tarwater had told S.L. that he was "worried" about the case and that the District was going to settle it.

19.     During K.P.'s junior year of high school, Superintendent Prewitt retired and the School Board promoted Tarwater to the position of Superintendent. At the same time, the School Board promoted Kathy Butler to the position of principal of LJHS, where she was also designated as the Title IX compliance coordinator.

20.     The School District has no separate administration building. Rather, the administration offices are housed within the high school. Tarwater—both as principal and as superintendent—had easy access to students before, during, and after the school day. As superintendent, Tarwater's office was next door to Kathy Butler's office.

---

2.   As set forth in a separate complaint filed by S.L., Tarwater began "grooming" S.L. during her sophomore year of high school, which he ultimately escalated into a sexual relationship following her graduation. On information and belief, LJSD had actual knowledge that Tarwater had engaged in inappropriate conduct directed at S.L. both while she was attending LJHS and following graduation, including during school-sponsored summer trips in 2016 and 2018.

## TARWATER'S PREDATORY SEXUAL GROOMING

21.     Sexual predators commonly use a series of psychological and emotional abuse tactics to coerce a victim into a sexual relationship, a process that may take place over an extended period of time and which is known as predatory sexual grooming. *See* Georgia M. Winters & Elizabeth L. Jeglic (2017), *Stages of Sexual Grooming: Recognizing Potentially Predatory Behaviors of Child Molesters, Deviant Behavior*, 38:6, 724, 725 (2017).

22.     "Empirical research has found that nearly half of the offenders who commit sexual acts against children utilize what are known as grooming behaviors." *Id.*; *see also* R. Fossey & T. Mitchell, *Title IX's "Deliberate Indifference" Standard for Determining School Liability Under Title IX When Students Are Sexually Abused by School Employees: A Trust Betrayed*, 299 Ed. L. Rep. 811, 814 (2014) (noting that it is well-established "in the research literature that abusers often develop inappropriate sexual relationships with students through a 'grooming' process whereby the abuser first breaks down verbal boundaries with his victim through inappropriate conversations about sex before moving on to violating physical boundaries.")

23.     Predatory sexual grooming is a preparatory process in which a sexual predator acts methodically and over time to:  (a) target a victim; (b) secure regular access to the victim while at the same time gradually isolating her/him from others; (c) gain the victim's trust, and (d) use the trust and isolation to control and conceal the relationship, often with the assistance of the victim. "Abusive educators often 'groom' their students by treating them in a special manner: starting slowly and building their trust and increasing their attachment and vulnerability.  Isolation of the student and guilt are often part of the grooming process.  Signs of grooming may include inordinate amounts of attention being paid to a student, sexual comments and innuendos directed at students, pulling the student from classes for private meetings, giving gifts, inappropriate touching (sitting

6

on the teacher's lap, hugging, stroking, etc.)." Fossey & Mitchell, 299 Ed. L. Rep. at 839-40 (2014).

24.     Sexual predators skillfully employ these predatory sexual grooming tactics to manipulate a child so that sexual abuse can be more easily committed.  Winters & Jeglic, *Deviant Behavior*, 38:6 at 724-25. Sexual predators employ these tactics while "keeping a guise of being kind, charming, and helpful. They strategically manipulate the victim, their family, and the community to hide their deviant intentions and avoid detection. These behaviors include strategies such as selecting a vulnerable victim, gaining access to the child, developing trust, and desensitizing the victim to touch."  *Id.* (citations omitted).

25.     Victims of grooming are typically unaware they are being manipulated and do not consciously perceive the perpetrator's conduct is inappropriate, but may nonetheless lie to peers or family members or take other steps to conceal their relationship with the perpetrator.  *Id.*

26.     Importantly, exposure to predatory sexual grooming tactics is alone sufficiently traumatic to inflict lasting psychological injury on the victim.  Peer-reviewed studies have found that that it is "not only the experience of sexual abuse (or even the severity of such abuse) that determines the severity of trauma symptoms in survivors, but also the grooming experience. Each of the three methods that the perpetrators used to coerce their child victims into the sexual abuse added to the overall trauma experience for the survivors in this study."  Molly R. Wolf & Doyle K. Pruitt, *Grooming Hurts Too: The Effects of Perpetrator Grooming Types on Trauma Symptoms in Adult Survivors of Child Sexual Abuse*, J. of Child Sexual Abuse (March 25, 2019).

27.     Part of the reason predatory sexual grooming is effective is because it plays on a victim's emotional vulnerabilities. A perpetrator will develop intimacy with a victim whereby the

victim discloses secret, often shameful information. In turn, a perpetrator will use that information to later exploit the victim, use it against him/her, or further manipulate the victim.

## TARWATER TARGETS AND BEGINS TO ISOLATE K.P.

28.     As detailed further below, beginning when K.P. was a minor and no later than her junior year at LJHS and continuing through and after graduation, Tarwater targeted K.P. with these predatory tactics with the goal of coercing K.P. into a sexual relationship, as he had done with S.L.

29.     By the beginning of K.P.'s junior year, Tarwater was showing a particular and obvious interest in her.  In fact, in one conversation during K.P.'s junior year, Tarwater told her that he "thought she was special when he first spotted her at school in the seventh grade."

30.     The first step in the grooming process is the selection of a victim, which can be based on appeal, attractiveness, ease of access, or perceived vulnerabilities of the child.  More specifically:

> [C]hild molesters are also found to target children based on family situations, such as those living in single family households as often in these cases children may have less adult supervision or the custodial parent may rely upon others to help with childcare responsibilities.  Further, children who have families with alcohol or drug addictions, emotional or mental problems, marital discord, domestic violence issues, or that are neglectful are at higher risk for sexual abuse as these situations may also lead to less parental supervision. *The offender may also seek children with perceived psychological vulnerabilities that would allow the child to be more easily isolated from others, such as low self-esteem, low confidence, insecurity, neediness, or naivety.*

Winters & Jeglic, Deviant Behavior, 38:6 at 725 (emphasis added).

31.     Tarwater granted K.P. special privileges such as allowing her to skip class, walk freely about the school while class was in session, postpone and/or retake tests, and inviting her to "hang out" in his office.  K.P. never observed and was not aware of Tarwater conferring the same level of privileges on other students, nor giving the same level of attention to any other students.

8

32.     On information and belief, K.P.'s school records contained detailed educational and personal information, including the fact that she was receiving counseling for anxiety disorder, and that K.P.'s parents divorced when she was a young child and that she was now living with her mother and stepfather. This information was readily accessible to Tarwater, and he would exploit this information to gain K.P.'s trust and confidence as further set forth below.

33.     Tarwater frequently encouraged K.P. to talk about personal matters, inviting her to confide in him whenever she needed and offering that his office door was always open if she needed to talk, including about problems with anxiety and other vulnerabilities documented in her student files or which he was able to elicit directly during their frequent private conversations. He succeeded in persuading her to share personal information by telling her that he too struggled with major depression daily and purportedly had a difficult childhood.

34.     Tarwater's behavior in all of these respects is consistent with the second stage of the grooming process, which "involves the child molester gaining access to the potential victim, with the goal of isolating the child both physically and emotionally from those around them." Winters & Jeglic, *Deviant Behavior*, 38:6 at 726; see also R. Fossey & T. Mitchell, *Title IX's "Deliberate Indifference" Standard for Determining School Liability Under Title IX When Students Are Sexually Abused by School Employees: A Trust Betrayed*, 299 Ed. L. Rep. 811, 814 (2014) ("Abusive educators often 'groom' their students by treating them in a special manner: starting slowly and building their trust and increasing their attachment and vulnerability. Isolation of the student and guilt are often part of the grooming process. Signs of grooming may include inordinate amounts of attention being paid to a student, sexual comments and innuendos directed at students, pulling the student from classes for private meetings, giving gifts, inappropriate touching (sitting on the teacher's lap, hugging, stroking, etc.)." Most survivors report that the

9

emotional isolation and control employed by the perpetrator is more impactful, and more traumatizing, than the physical or sexual abuse it precedes.

35.     Before the end of K.P.'s junior year, Tarwater began making plans to meet with K.P. outside of the school setting for non-school purposes in violation of multiple District Policies. *See* District Policy GBH(2) (prohibiting staff from "meeting students in non-work settings without the parent/guardian being present, even if the parent/guardian grants permission.").

36.     Tarwater asked K.P. to give his children bi-weekly swimming lessons over the summer.  Because K.P. worked as a life guard and regularly gave swimming lessons at her workplace, she initially assumed this was where she would be giving lessons to Tarwater's children.  However, Tarwater insisted they use the pool located at his residential subdivision.

37.     Over the summer, K.P. gave Tarwater's children approximately a half-dozen lessons.  K.P. would meet Tarwater at his home before going to the pool together.  On several occasions, Tarwater remained to watch, sometimes getting in the pool shirtless wearing only swim trunks.  On one occasion, after the lesson, Tarwater "side-hugged" K.P. from behind when she was draped with a towel.  On another occasion, Tarwater insisted K.P. come to his home to change her clothes, a violation of District Policy.  *See* GBH(2) (barring school personnel from "[i]nviting students to the staff member's home.")

38.     After acquiring K.P.'s cell phone number, ostensibly to arrange the swim lessons, Tarwater began texting K.P. about non-school matters having no educational purpose.  In so doing, he also violated relevant provisions of District Policy GBH, which provides:  "Staff communications must be professional, and student communications must be appropriate.  Staff members may only communicate with students electronically for educational purposes between

the hours of 6:00 a.m. and 10:00 p.m. Staff members may use electronic communication with students only as frequently as necessary to accomplish the educational purpose."

39. In August 2018, K.P. began her senior year at LJHS. The 2018-19 school year was also Tarwater's first full year as Superintendent of LJSD.

40. By the fall of 2018, Tarwater was texting K.P. with increasing frequency; multiple times per week. Upon information and belief, Tarwater was also communicating via text messages on non-school matters with another female student who was K.P.'s best friend.

41. While K.P. initially felt it was at some level inappropriate to be communicating with Tarwater via text messages about non-school related matters, she ultimately dismissed this concern because she had come to view Tarwater as a "friend" and even a "father figure."

42. Tarwater also attempted to normalize their communications, telling her that it was all right because "we're becoming friends." Yet, at the same time, Tarwater frequently directed K.P. to delete all of his messages or her replies, constantly reminding her to do so. K.P. told him that she would and usually did.

43. Notably, "[c]hild molesters often seek jobs that involve contact with children like teachers, camp counselors, bus drivers, or coaches. Those who establish themselves in professional settings may create reasons to see the child after school hours or offer to take them on outings." Winters & Jeglic, *Deviant Behavior*, 38:6 at 726. These activities typically exclude other adults, in an attempt to get the child alone to engage her in communication. *Id.* Frequently, male offenders attempt to assume the role of a "father figure" for the child. *Id.*

44. Tarwater also escalated the kind and degree of special privileges he bestowed on K.P., allowing her to skip class, postpone exams if she needed additional time, freely walk the halls, and leave school premises during the school day. He maintained a box of "Pop Tarts" for

her in his office, always kept her favorite mints in his office, and permitted her to use over-the-counter medications like ibuprofen, allergy medications, etc., that he kept in his office.

45.     Tarwater's behavior in all of these respects is consistent with the third stage of the grooming process which involves the emotional recruiting of the victim to develop trust. "This step is often regarded as the central role of the grooming process, wherein the offender establishes trust and cooperation with the victim." Winters & Jeglic, *Deviant Behavior*, 38:6 at 726. "The offender accomplishes this by be-friending the child, by learning about his/her interests, being helpful, showering the child with gifts and attention, or sharing secrets." *Id*.

46.     Tarwater's conduct toward K.P. did not go unnoticed, however.  By K.P.'s junior year, both of K.P.'s younger brothers, who also attended LJHS, observed and grew suspicious of Tarwater's treatment of K.P.  Both siblings could see Tarwater acted "weird" toward K.P.

47.     Others noticed as well.  In fact, by K.P.'s senior year, Tarwater's predatory tactics had become so open and obvious that it was widely known among high school staff and administrative personnel that K.P. was Tarwater's current "favorite."

**REPEATED COMPLAINTS**

48.     Upon information and belief, in or about October 2018, a cafeteria worker at LJHS made a complaint to Kathy Butler that Tarwater's behavior around K.P. was inappropriate and made her uncomfortable.

49.     As the District's designated Title IX Coordinator, Kathy Butler was an "appropriate person" authorized to investigate and resolve complaints of sexual discrimination and harassment.

50.     Upon information and belief, Butler took no steps to investigate the October 2018 complaint, which should have remained confidential.  Instead, in direct violation of Title IX and

School District Policy, Butler or Roth alerted Tarwater about the complaint, the identity of the complainant, and the allegations involved.

51. Tarwater immediately took action to cover-up his conduct and by manipulating K.P. and intimidating L.M. from taking further action.

52. First, Tarwater told K.P. about the complaint, and lied to her saying he had already spoken with L.M., that L.M. did not believe the allegations, and that L.M. had indicated it was "okay" for them to continue hanging out because L.M. "trusted him." At the same time, Tarwater warned K.P. that they needed to be more careful not to appear "too friendly."

53. Second, Tarwater appeared unexpectedly in L.M.'s classroom in order to demonstrate his power and intimidate her from taking action. Tarwater told L.M. the "compliance officer" had told him about a complaint. Attributing the complaint to an unnamed cafeteria worker, Tarwater explained that he was only interested in helping K.P. succeed and denied that he had ever acted inappropriately. Nevertheless concerned, L.M. told Tarwater to refrain from further contact with K.P., and Tarwater assured he would. That night, L.M. also demanded K.P. refrain from further contact with Tarwater.

54. Finally, Tarwater confided in S.L. that he was the subject of a Title IX complaint, that an unnamed cafeteria worker reported to Kathy Butler that his behavior toward a female student was inappropriate and made her (the complainant) feel uncomfortable, and that the female student was K.P. Tarwater also told S.L. that it was School Board President Kellie Roth who had informed him about the complaint.

55. Despite L.M.'s demand that Tarwater have no further contact with K.P. and his assurances he would not, Tarwater resumed text messages with K.P. within two weeks and again

sought to engage her on personal non-school related subjects. Soon, Tarwater was exchanging texts with K.P. on a daily basis.

56. Tarwater also sought to make the complaint a running joke, telling K.P. "make sure that the lunch lady doesn't see us."

57. Throughout the remainder of the fall semester, Tarwater continued escalating his special attention for K.P. Tarwater permitted K.P. even more leeway to "hang out" in his office whenever she wished. She would visit him before school, throughout and after the school day. She began spending hours each day alone with Tarwater in his office, often with the door closed. When the door was not closed, he directed K.P. to stay near the conference table, out of view of his secretary. Tarwater repeatedly warned K.P. to avoid being seen coming and going. All of this was in direct and clear violation of District Policy GBH, which prohibits staff from "[b]eing alone with a student in a room with a closed or locked door or with the lights off."

58. During meetings in his office, in addition to engaging K.P. on personal topics, Tarwater exploited the power and authority he had as Superintendent, inappropriately sharing with K.P. confidential information concerning the district, his plans to terminate the employment of school personnel, and personal information concerning other students. Because K.P.'s mother was employed by the District as a teacher and Tarwater was her boss, Tarwater's statements carried with them both an element of bragging to impress K.P. and an implicit threat of retaliation.

59. In November 2018, K.P. competed in Jefferson City at the state cross-country meet. Although she was the only athlete from LJHS in the competition, Tarwater (who was in Jefferson City on LJSD business and scheduled to return before the event), extended his hotel reservation an additional night so that he could watch her compete.

60. Toward the end of the fall semester 2018, Tarwater asked K.P. to come to his home and babysit his children over the winter break, again in violation of Policy GBH(2). She declined because of a scheduling conflict.

61. Around the same time, the maintenance director at the high school asked Tarwater what was going on with the girl that was in Tarwater's office every morning, noting the situation looked bad for Tarwater and people were talking about it. Unsatisfied with Tarwater's response, the maintenance director reported the conversation to Kathy Butler, noting Tarwater's behavior was weird and did not sit right with him. Ms. Butler indicated she would look into it.

62. Upon information and belief, Butler took no steps to investigate this additional complaint, to take appropriate with respect to the complaint, or to protect the maintenance director from retaliation. Tarwater took immediate action to ensure the maintenance director was fired.

63. Upon information and belief, in or around January 2019, despite known concerns about Tarwater's behavior around students, School Board President Kellie Roth extended Tarwater's contract and increased his pay.

64. By the start of the spring 2019 semester, Tarwater was regularly monitoring the stories and photos that K.P. posted on Instagram. When K.P. mentioned she had noticed Tarwater viewing one of her posts, he denied ever having seen it. K.P. inferred from this fact that Tarwater apparently assumed erroneously that he could view her posts anonymously.

65. When her friends teased her about the nature of her interactions with Tarwater, K.P. would only tell them that she and Tarwater had "grown extremely close," that he had become a "good friend" and thought of him like her "third Dad."

66. In or about February 2019, Tarwater learned K.P. was working out and running at Legacy Park. He began asking her to "let him know when she was going" so that he could join

her in working out.  K.P. did not do so because L.M. did not permit K.P. to go to Legacy Park unless she was accompanied by one of her brothers.  If Tarwater learned she had worked out at Legacy Park, he would guilt her saying things like "wow, you went and didn't tell me."

67.     Prior to K.P.'s graduation in spring of 2019, Tarwater became aware that K.P. was in the midst of a breakup with a former LJHS student who graduated the year before and was attending college.  Tarwater used the opportunity to "counsel" K.P. about the situation, his characterization of what in reality were opportunistic efforts to engage K.P. on emotional and sexual topics.  These conversations continued through the end of the semester and continued over the summer after K.P. graduated.  Upon learning that one reason for the breakup involved "not putting out enough," Tarwater asked K.P. if she ever had sex with anyone other than her boyfriend and inquired whether she had sent her boyfriend nude pictures of herself ("You don't private send them to your man?").  When K.P. expressed fear that she might never find anyone else who loved her, Tarwater assured her "I would date you if I was 18."

68.     Over the course of her junior and senior years, Tarwater gradually escalated the nature and frequency of physical contacts with K.P., beginning with seemingly innocent "side hugs," advancing to frontal hugs, shoulder massages and eventually even playing with her hair, pulling a strand away from her face and running his fingers through it.  By end of her senior year, this type of conduct would occur throughout the school day, including when the two were alone in his office.

69.     Because of Tarwater's assumed persona and position of authority, K.P. was unable to perceive his methodical escalation of "innocent touching" to be inappropriate or as means for his own sexual gratification, nor was she aware that she was gradually becoming desensitized to physical contact -- which is, of course, exactly the result Tarwater intended to accomplish.

70.     The fourth stage of the grooming process involves "gradually increas[ing] physical contact in order to desensitize the child to touch." Winters & Jeglic, *Deviant Behavior*, 38:6 at 727. "Often times this begins with seemingly accidental touch or innocent behaviors, which then escalate to more intimate touching. For example, the child molester may first give the child hugs or pats on the back, and then gradually escalate to wrestling, tickling, or back massages and the eventual sexual contact." *Id.*

71.     Upon information and belief, in or about March of 2019, six parents complained to Kathy Butler about Tarwater's inappropriate behavior toward a group of senior students including K.P.  Upon information and belief, the District again failed to investigate or take appropriate action with respect to the complaints; instead Kathy Butler told Tarwater she did not want to have another discussion with Tarwater about his behavior with students, indicating Kathy Butler not only had actual notice of repeated concerns about Tarwater's conduct toward students but also that any prior "discussions" or other purported remedial measures were wholly inadequate and ineffective.

## TARWATER'S PREDATORY TACTICS CONTINUE UNABATED

72.     Late in K.P.'s senior year, Tarwater began strongly encouraging her to consider going on the semi-annual summer trip abroad jointly sponsored by the LJSD and the Harrisonville School District, scheduled to go to Costa Rica the following summer.  Tarwater told K.P. she "really needed to go."

73.     K.P. graduated LJHS in May 2019.  The last day of the school year was May 15.

74.     Tarwater texted K.P. throughout the weekend before her last days of school, including the following messages referencing a conversation about her ongoing break-up:

Friday, May 10, 3:39 p.m.:

I feel like I upset you. I'm really sorry if I did. I'm incredibly proud of you, [K.P.]! Good luck tomorrow. Love ya, [K.P.].

Friday, May 10, 4:42 p.m.:

What I said may have been way off base. I just want you to think and be careful because I know you don't think of those things . . . because you're genuinely just a great, kind person.

75.     During the course of these conversations, Tarwater attempted to curry sympathy for himself, texting "[m]y antidepressants don't allow me to feel anything." When K.P. responded that she was able to get him to laugh, Tarwater responded "until Wednesday [in reference to her last day of school]. And then I have nothing." This was an attempt to use guilt and assign undue responsibility in order to emotionally control K.P.

76.     On the last day of school, when alone in his office, Tarwater embraced K.P. in a frontal hug and kissed her on the forehead. Tarwater also began following K.P. on Instagram.

77.     Post-graduation, Tarwater continued communicating with K.P. via text messages and through Instagram. These communications are shockingly inappropriate and obviously designed to further Tarwater's ultimate goal of coercing K.P. into a sexual relationship.

78.     For instance, Tarwater offered to give K.P. money ("If you ever need anything....I gotchoo"), invited her to stay in the guest room at his house ("I've got a guestroom. . . . The bed is the most comfortable bed in the world."), and told her that he typically slept in the guestroom instead of in the bedroom with his wife ("Just don't [sleep in the bedroom]. Like [the guest] bed better. Doesn't make my back hurt. I like sleeping alone.").

79.     Tarwater repeatedly expressed love for K.P. ("Love ya, [K.P.]"), referred to K.P. in pet terms ("Goodnight, dear"), and encouraged her to see or meet him ("Glad I got to see you

18

today;" "I would like to see you;" "Thinking about you;" "I wish I could hang with you tonight. I need to laugh.").

80.     Tarwater frequently bemoaned his own personal problems ("I'm riding the struggle bus today . . . Just can't function today…..bad depression today").

81.     Tarwater even acknowledged, albeit sarcastically, that his conduct was wrong and unacceptable ("ya know…..it's inappropriate for me to have students as friends," "I don't think [L.M.] would approve of us hanging out together," "I'm oooooold and people think it's creepy . . . Which, idk…..maybe it is. I don't want it to be …….but").

82.     Even after graduation, K.P. continued meeting Tarwater in person at the high school to talk or to bring him coffee from Starbucks, sometimes accompanied by a friend.

83.     At Tarwater's insistence, K.P. also began meeting Tarwater at Legacy Park to work out. Once K.P. graduated, her mother L.M. no longer required her to be accompanied by one of her brothers. Despite ostensibly meeting to work out, Tarwater would instead often invite K.P. to sit together and talk in his car.

84.     During these in-person meetings, Tarwater would initiate conversations about K.P.'s breakup and personal life, and would purport to empathize with her by sharing his supposed personal problems, depression and troubled relationship with his wife, at one point telling K.P. that he thought it would be best if his wife took their children and left him. At the same time, he continued showing interest about whether K.P. was dating anyone herself.

85.     When K.P. told Tarwater she and her friend were planning a summer vacation and that she had bought two new swimsuits, Tarwater texted back "Normally, I would say I wanna see" and later after photos were not forthcoming followed up with "Not in this instance. I don't want to be creepy."

86.     Over the summer, K.P. and her best friend worked as servers at a restaurant in John Knox Village, a nearby retirement community.  One day, Tarwater appeared unannounced to dine at the restaurant, and insisted on leaving a $100 cash tip for each of them.

87.     On another occasion, Tarwater asked K.P. how much money she received from her graduation party and offered to give her several hundred more dollars so she could purchase a Macbook, despite known objections of her mother.

88.     "Testing" is another classic grooming strategy where, by encouraging the victim to disobey the wishes of parents or taking the victim's side against parents, the perpetrator is able to test his influence over the victim and the likelihood that the parents will intervene.

## TARWATER RETALIATES AGAINST E.M.
## TO MANIPULATE K.P. AND L.M.

89.     In mid-August, after K.P. had left for her freshman year at college, Tarwater suspended K.P.'s younger brother E.M. for the first 10 days of school because of an incident at a soccer outing a few days before school started.  Among other additional punishments, Tarwater took away E.M.'s entire junior soccer season.  The punishments were incredibly excessive.

90.     Tarwater's direct personal involvement in devising a punishment for K.P.'s brother E.M. was unusual in and of itself because student disciplinary matters were typically handled by Assistant Principal Jason Fenstermaker. However, Tarwater's involvement is particularly troubling here, because at the time Tarwater was aware of prior complaints about his conduct toward K.P. about which he had confronted L.M.

91.     Tarwater's purpose in becoming personally involved in E.M.'s punishment was to further his own ends by manufacturing a subject for continued communication with K.P. as well as leverage to deter K.P. and L.M. from taking action.  Tarwater's behavior in this regard was

intentional, malicious and in conscious disregard of E.M.'s due process right to free and appropriate education and L.M.'s Title IX rights to be free from retaliation.

92.     Indeed, while punishing E.M., Tarwater was contemporaneously texting with K.P., making light of the entire situation and falsely claiming he was not involved but "the district attorney and the safe schools act . . . dictated the decision."  Tarwater even agreed with K.P. that her younger brother presented no threat to anyone, that his punishment was disproportionate, and that the other student involved "shouldn't be such a pussy."

93.     Around the same time, Tarwater texted K.P. "does your mom know we message," claiming he had absentmindedly mentioned to L.M. that he had spoken with K.P. the day before. K.P. assured that her mother did not know of their ongoing communications.  Upon information and belief, Tarwater was actually trying to gauge how much K.P. communicated to her parents so he could attempt to manipulate K.P. and L.M. simultaneously through the punishment of E.M.

## S.L. COMES FORWARD TO RAISE ALARM

94.     On September 1, 2019, Tarwater arranged to meet K.P. and her best friend at the Lone Jack Starbucks.  After paying for the girls' coffee, Tarwater invited them out to lunch. Tarwater then drove K.P. and her friend to McAlister's, a restaurant in Lee's Summit.  During the drive, Tarwater engaged the girls in personal subjects and discussed his purportedly ongoing struggle with depression and troubled relationship with his wife.

95.     As alleged by S.L.'s complaint, over the summer of 2019, and with the benefit of counseling and support of her family, S.L. began to understand that her interactions with Tarwater had not been consensual, but that Tarwater had been methodicly grooming and manipulating her toward a sexual relationship since she was a minor and high school student.

96.     On or shortly after September 1, S.L. saw a photograph on social media that immediately caused her alarm. It was a picture of Tarwater with his arms draped around K.P. and her friend taken at Starbucks with the words "Best Friends" superimposed over the picture.

97.     S.L. feared Tarwater was grooming K.P. just as he had done with her. S.L. determined to alert K.P. and her parents about Tarwater.

98.     Because S.L.'s and K.P.'s families were not well acquainted, S.L.'s step-mother contacted K.P.'s parents through a mutual friend and arranged a meeting.

99.     On September 19, 2019, S.L. and her step-mother met with K.P.'s parents at Panera's in Blue Springs to inform them about what Tarwater had done to S.L.

100.    Following the meeting, L.M. called K.P. and directed her to stop communicating with Tarwater. In order that K.P. not immediately alert Tarwater, and so as not to cause K.P. further trauma, L.M. did not mention anything about S.L. or suspicions of abuse; rather L.M. told K.P. that she needed to stop communicating with Tarwater in order to protect E.M.

101.    On September 28, 2019, after K.P. failed to respond to several messages, Tarwater Instagram messaged K.P. "[K.P.], if I unintentionally upset you in any way, I'm extremely sorry. You know how much you mean to me. Love ya, dear."

102.    On October 7, after Tarwater apparently had been tipped off that additional complaints about his conduct toward K.P. were forthcoming, Tarwater began informing L.M. and her husband that he was extending the punishment of E.M. through the entire fall semester. Tarwater was using his control over the punishment of E.M. to intimidate them from taking further action, and as a pretext to call and to confront L.M. and her husband about K.P.

103.    On October 7, 2019, L.M.'s husband e-mailed Tarwater informing him that a parent needed to be present when he met with E.M.

104.     Tarwater responded the next day, informing L.M. and her husband that he had already met individually with E.M. and had formulated his own discipline plan for their son, attaching a copy.  The "plan" reflected extended and unwarranted additional punishment.

105.     L.M.'s husband immediately responded, telling Tarwater that:  "I'm a bit surprised with your statement of getting him back to 'normal' by semester.  That would mean he would be dealing with the fallout of the issue for an entire semester. I think that's overkill, as I believe we discussed the end of soccer season as the date to reevaluate his situation."  L.M.'s husband further stated that: "Also, in the future, I would appreciate either [L.M.] or myself being included on any conversations you have with [E.M.]."

106.     Tarwater responded a few minutes later, saying:  "I am perfectly fine with you being as involved as you would like. If one of you could give me a call to discuss this, that would be great. ***I don't want my messages to be misinterpreted through e-mail***.  I would like to explain my 'semester' comment in a little more detail."  (emphasis added).

107.     In reality, Tarwater was seeking to avoid a written record of his efforts to intimidate L.M. and her husband from taking action with respect to K.P.

108.     On October 8, 2019, at around 10:00 a.m., Kathy Butler appeared unexpectedly in L.M.'s classroom, said she needed to talk to her, and led her into a back office at the elementary school.  When L.M. entered the office, Tarwater was already there waiting.  Tarwater told Kathy Butler "you can go now," and Butler complied closing the door behind her.

109.     Alone with L.M., Tarwater began discussing the disciplinary issue with E.M.  L.M. told Tarwater the punishment was excessive, and her son was never rewarded for doing the right things during the time he was at school after he came back. Tarwater agreed.  After briefly discussing E.M., Tarwater stated, "that's not the real reason I'm here."

23

110. Tarwater then informed L.M. that there were rumors going around that he had an inappropriate relationship with K.P. L.M. said she couldn't comment on that issue, and she didn't feel comfortable discussing it. Tarwater nevertheless asked, "do you think I've had sexual relations with [K.P.]?" L.M. responded she did not think so, but didn't know.

111. In response, Tarwater got very upset, then started pacing around the room. Tarwater hissed, "how could you say that?" L.M. responded, "because I told you to stop seeing her and texting her, and you didn't." L.M. also told Tarwater "you're the superintendent, you shouldn't have that sort of contact with the kids." Tarwater admitted as much, saying, "I know." L.M. reiterated, "You stay away from my family."

112. Tarwater then confessed to L.M., "I have these demons, and I look for kids that are needed, and I concentrate on them, as it keeps me from thinking about my problems." By saying this, Tarwater not only admitted targeting K.P. and other students, he admitted that he recognized the wrongfulness of his conduct but yet had taken no measures to distance himself from children, consciously placing his perceived needs/desires before the well-being of children.

113. Horrified, L.M. responded, "those are your problems, and you still need to stay away from [K.P.]." L.M. added, "you're breaking the policies that YOU wrote."

114. Tarwater again admitted his misconduct, saying "I know." Tarwater began crying and told L.M. he intended to resign as superintendent. L.M. ended the meeting, saying, "get yourself together before you leave, and stay away from my daughter." As he walked out the door, Tarwater repeatedly mumbled, "I've got to get in touch with K.P." After Tarwater left, L.M. told Kathy Butler, who had stationed herself outside the room, "you keep that man away from me."

115. As S.L.'s and K.P's families have continued sharing their experiences, a disturbing pattern emerged in the way Tarwater interacted with both S.L. and K.P.:

- S.L. and K.P. are a similar "type" of girl. Both are attractive, athletic, well-liked, and high achievers. Additionally, they were close to the same age when Tarwater began showing interest in them.

- Tarwater spent an exorbitant amount of time alone with both S.L. and K.P., allowing them to miss class time in order to be alone with him. Both S.L. and K.P. indicated Tarwater portrayed himself as a father figure or "like a dad" to them, which is indicative of his efforts to establish trust with them. Furthermore, Tarwater persuaded S.L. to attend international trips with him and attempted to have K.P. do the same.

- S.L. and K.P. were both aware that Tarwater and a few others had real-time access to an extensive security camera system enabling surveillance of various areas around the school. The camera system showed the front office area outside of Tarwater's office.

- S.L. and K.P. both confirmed Tarwater would commiserate with them about anxiety/depression issues and would say that his wife didn't understand because she didn't deal with anxiety/depression herself.

- Tarwater told both S.L. and K.P. that he didn't sleep in the same bed as his wife, and that he had relationship problems with his wife. Over time he went from talking about his wife by name or by reference as "my wife" to simply saying "the wife" in order to trivialize her role in his life.

- Tarwater relayed his history as one of victimization to both S.L. and K.P.; for example, Tarwater claimed that: (a) he was accepted to Julliard but didn't go because of his high school girlfriend who later cheated on him; (b) he was kicked out of college because of a false charge of plagiarism; (c) his wife didn't love him or was too good for him because his pills didn't work or because he 'couldn't feel anything anymore' and that she should take the kids and leave him.

- Tarwater would often confide in both S.L. and K.P. about his own finances (e.g., how much he and his wife made, that his wife made more than him, how much money was in his personal bank account, how much student debt he had, whether he should/could buy cars or take expensive trips).

- Tarwater would often confide in both S.L. and K.P. about other students' problems, or other teachers, including his opinions and plans for disciplinary actions.

- Tarwater attempted to gain the trust of both S.L.'s and K.P.'s families by, for example, contacting them directly and attempting to prevent them from developing concerns about his behavior.

- The physical escalation seems to be identical with S.L. and K.P. Tarwater initiated touch with a side hug, which appears innocent and can be easily justified as a harmless and sincere gesture. Following the side hugs were the front hugs, which allowed Tarwater to initiate touch with additional parts of the girls' bodies and normalize the contact. Tarwater then progressed to massaging both girls' shoulders, and kissing both of their foreheads on the last day of school. Additionally, Tarwater engaged in conversations of an intimate and eventually sexual nature with both girls, asking questions about their dating relationships and sexual experiences, demonstrating his physical touching was all for the purpose of deriving sexual gratification.

116. Over the course of her junior and senior years of high school, and into the beginning of her freshman year of college, K.P. became increasingly isolated from her friends and family and suffered other psychological trauma as a direct result of Tarwater's grooming. She suffered from increasing anxiety and low self-esteem, feelings Tarwater himself fostered and manipulated to facilitate and perpetuate his predatory ends.

117. K.P. is only now beginning to come to terms with the fact that her interactions with Tarwater were not and could not have been consensual, and that he was not acting as a "father figure" but instead was grooming her for a sexual relationship just as he had with S.L. K.P. currently suffers from recurring nightmares and has lost trust for almost any adult.

118. The psychological and emotional damage inflicted by Tarwater upon K.P. by his grooming and manipulation caused K.P. to feel shame, humiliation, self-blame, confusion and depression, and will continue to inflict long-lasting and potentially permanent harm that will affect K.P.'s relationships, employment and self-sufficiency, for which K.P. will need ongoing treatment, counseling and medication.

## COUNT I
### (Violation of Title IX Against Defendant LJSD)

119. Plaintiffs incorporate by reference the allegations set forth in Paragraphs 1-118 hereinabove.

120. Plaintiff K.P. brings this Count for violation of Title IX against Defendant LJSD.

121. The LJSD and LJHS are and were at all relevant times a recipient of federal funding.

122. Defendant LJSD, by and through its employees and agents, had the duty to provide Plaintiff with a suitable education.

123. At all relevant times, Defendant Matthew Tarwater is and was an "appropriate person" with the authority and ability to address and end the discriminatory conduct alleged herein.

124. At all relevant times, as principal of LJHS, Kathy Butler is and was an "appropriate person" with the authority and ability to address and end the discriminatory conduct alleged herein.

125. At all relevant times, as president of the school board, Kellie Roth is and was an "appropriate person" with the authority and ability to address and end the discriminatory conduct alleged herein.

126. As appropriate persons, the School District is deemed to have actual knowledge of all complaints of discriminatory conduct of which Tarwater, Butler and/or Roth were aware.

127. As appropriate persons, Tarwater, Butler and Roth had actual knowledge that Plaintiff K.P. was subjected to sexual harassment, misconduct, and abuse, for which Tarwater was also personally responsible.

128. Tarwater, Roth and Butler had actual knowledge that the conduct he engaged in with respect to K.P. violated state and federal laws, School Board Policies, his ethical responsibility as an educator, and Title IX itself.

129.    As an appropriate person, Tarwater had at a minimum an obligation not to engage in sexual harassment of female students, or to self-report such misconduct to the District or other appropriate person.

130.    As appropriate persons, Roth and Butler had at a minimum an obligation to take reasonable action designed to prevent Tarwater from abusing his position of authority or otherwise to hold Tarwater accountable for his conduct to prevent continuing commission of misconduct.

131.    Additionally, as school officials, Butler and Roth were each mandatory reporters, yet also failed to comply with their obligations as such in further violation of applicable law and school policy.

132.    Tarwater's harassment of K.P. as alleged herein was severe, pervasive, and objectively offensive.

133.    Tarwater's harassment of K.P. as alleged herein deprived Plaintiff of access to the educational benefits and opportunities offered by LJHS.

134.    Tarwater's harassment of K.P. as alleged herein occurred in the context of an education program or activity.

135.    LJSD and LJHS were deliberately indifferent to the harassment and discrimination alleged herein and Tarwater's continuing violation of Title IX by, among other things, failing to adopt or enforce any policy or procedure designed to prevent Tarwater from abusing his position of authority or otherwise being held accountable for such conduct.

136.    Defendant LJSD's policies and procedures for reporting, investigating, and resolving claims of sexual harassment were inadequate or ineffective.

137.    Defendant LJSD failed to offer adequate training to employees to recognize, report, and investigate unlawful discrimination on the basis of sex and to prevent and police behaviors known to be associated with sexual grooming of students.

138.    The aforesaid occurrences were the direct and proximate result of the deliberate indifference of Tarwater, Roth and Butler, LJSD's employees and agents, while acting within the course and scope of their employment by the District.

139.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff has suffered damages, including but not limited to severe emotional distress, psychological injury, and trauma, in addition to the costs associated with past and future medical and psychological treatment.  Plaintiff's exposure to Tarwater's grooming behavior while attending LJHS was alone sufficiently traumatic to inflict lasting psychological injury on the victim.

140.    Due to Defendants' acts and omissions, Plaintiff has been diagnosed with depression, chronic anxiety, and low self-esteem.  These injuries are lasting and potentially life-long.  They will also more likely than not affect Plaintiff's ability to form healthy, lasting adult relationships.

## COUNT II
### (Unlawful Retaliation Under Title IX Against LJSD)

141.    Plaintiffs incorporate by reference the allegations set forth in Paragraphs 1-140 hereinabove.

142.    Plaintiff L.M. brings this Count for unlawful retaliation in violation of Title IX against Defendant LJSD.

143. In addition to taking ongoing retaliatory action against L.M. through imposing unwarranted and excess discipline on E.M., the School District, through Tarwater and others, also engaged in retaliatory employment practices.

144. Under Missouri law, after completion of her fifth year teaching at LJSD, L.M. earned permanent or "tenured" teacher status.

145. On Friday, November 8, 2019, undersigned counsel sent a letter to the LJSD Board and Ms. Butler advising of K.P.'s Title IX claim against the District based on the above alleged misconduct by Tarwater. The letter further advised Ms. Butler and one or more members of the School Board apparently had knowledge of reports about Dr. Tarwater's behavior, but that District officials acted to prevent disclosure of and appropriate response to the reports.

146. Incredibly, the following Monday, November 11, 2019, LJHS Vice Principal Dr. Jesi Cygan informed L.M. that Kathy Butler had requested two formal evaluations of L.M. be performed this school year—one in fall semester and one in spring semester.

147. Given the timing and other circumstances, Ms. Butler's request for evaluations was intended to retaliate against L.M. for reporting or participating in an investigation of conduct potentially in violation of Title IX, 42 U.S.C. § 1983, and/or RSMo § 537.047.

148. Dr. Cygan's stated reasons for requiring L.M. to submit to in class observation as part of the District's routine teacher evaluation process is clearly pretext, considering that LJSD only conducts informal evaluations of ***non-tenured*** teachers annually.

149. The District's ordinary custom and practice is to conduct informal evaluations of ***tenured*** teachers on a three-year rotation, with the first such evaluation occurring on the third year of tenure. The District only conducts a formal evaluation of tenured teachers as a precursor for adverse actions, such as growth plans, termination and/or other discipline.

150.     As noted above, L.M. became a tenured teacher on the first day of the current [2019–20] school year.  She received informal evaluations as a non-tenured teacher in each of the previous five years. She received exemplary marks in each of those informal evaluations.  Per District practice, once tenured, she would not be due for another informal evaluation until the 2022–23 school year.  The District, therefore, knew or had reason to believe that L.M. would perceive Ms. Butler's request for evaluations as a threat the District would take adverse action.

151.     The pretextual nature of the District's action toward L.M. is further evidenced by that fact that Dr. Cygan's November 11 e-mail indicated Ms. Butler had also requested formal evaluations of four other teachers: Rikki Carpenter, Jennifer McManus, Tawana Berens, and Denna Coulson. The first three are long-tenured teachers who were due for informal evaluations per the three-year rotation. Ms. Coulson was the only other first-year tenured teacher on staff.  On information and belief, Butler requested formal evaluations of these four other teachers in order to create a pretext of legitimacy for the retaliatory evaluations of L.M.

152.     At the time the above e-mail was sent to L.M., Butler was aware that the District's outside Title IX investigator, Mikah Thompson, had requested interviews with K.P. and L.M. concerning Dr. Tarwater's improper and unlawful conduct as well as the District's knowledge of reports and response to that conduct in the near future.

153.     Obviously, preparing for a formal evaluation would interfere with L.M.'s ability to schedule an interview with the District's outside investigator, and the mere request for a formal evaluation was an implicit threat of adverse employment action.

154.     As an additional act of retaliation, on Friday, November 22, 2019, the last business day before K.P. was scheduled to interview with the School District's outside Title IX investigator, the District advised the punishment of K.P.'s brother wouldn't even abate at semester as the family

was told all along, but that the District's plan was to keep him isolated from other students the entire year, taking "online" classes in a secluded room at the school.

155.     Upon information and belief, the school board was scheduled to vote to renew or extent teacher contracts at the March 9, 2020 regular board meeting. In the days leading up to that board meeting, more than one person approached L.M. advising they had heard she was leaving, and that the district was going around asking other people to take her job.

156.     The actions of the District and its employees were intentional, retaliatory in nature, and designed to place L.M. in fear for both her job and her son's right to receive free and appropriate education.

157.     L.M. sustained damages as a direct and proximate result of Defendants' action, including but not limited to emotional distress and other non-economic damages.

## COUNT III
### (Section 1983 Due Process Claim Against All Defendants)

158.     Plaintiffs incorporate by reference the allegations set forth in Paragraphs 1-157 hereinabove.

159.     Plaintiff K.P. asserts this claim under 42 U.S.C. § 1983 for violation of her federally protected constitutional right to bodily integrity under the Due Process Clause of the United States Constitution.

160.     Plaintiff is a citizen of the United States of America.

161.     Defendant LJSD is a person under 42 U.S.C. § 1983 and is responsible for all official conduct by Tarwater, Butler, Roth and other agents and employees of the District.

162.	Defendant Tarwater is a person subject to liability pursuant to 42 U.S.C. § 1983. At all relevant times, Tarwater was a district official with final policymaking authority with respect to the subject matters alleged herein.

163.	Defendant Roth is a person subject to liability pursuant to 42 U.S.C. § 1983. At all relevant times, Roth was a district official with final policymaking authority with respect to the subject matters alleged herein.

164.	Defendant Butler is a person subject to liability pursuant to 42 U.S.C. § 1983. At all relevant times, Butler was a district official with final policymaking authority with respect to the subject matters alleged herein.

165.	All conduct by Tarwater, Roth and Butler alleged herein occurred under color of state law.

166.	Plaintiff has a constitutional right pursuant to the Fourteenth Amendment to the U.S. Constitution to equal protection of the laws and substantive and procedural due process.

167.	Plaintiff further has a protected property right to education, which cannot be denied arbitrarily and capriciously or without due process of law.

168.	Plaintiff has a constitutionally protected liberty interest to be free from sexual abuse in public schools and in any education program or activity receiving federal funds.

169.	Plaintiff has a constitutionally protected interest to be free from arbitrary and capricious actions that stigmatize her and create or disseminate a defamatory impression regarding her conduct.

170.	The course of sexual harassment and misconduct alleged herein deprived Plaintiff of her the constitutionally and federally protected rights enumerated above.

171.    Defendants Tarwater, Roth and/or Butler acted to deny Plaintiffs' federal protected rights with malicious intent.

172.    Defendants Tarwater, Roth and/or Butler acted with reckless indifference to Plaintiffs' federal protected rights.

173.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff has suffered damages, including but not limited to severe emotional distress, psychological injury, and trauma, in addition to the costs associated with past and future medical and psychological treatment.

174.    Due to Defendants' acts and omissions, Plaintiff has been diagnosed with depression, chronic anxiety, and low self-esteem.  These injuries are lasting and potentially life-long.  They will also more likely than not affect Plaintiff's ability to form healthy, lasting romantic relationships.

175.    The individual Defendants' acts and omissions described above were willful, wanton and malicious, and done with reckless indifference to Plaintiff's federally protected rights, entitling Plaintiffs to punitive damages against Defendants Tarwater, Roth and Butler in their individual capacities.

## COUNT IV
### (Section 1983 Equal Protection Claim Against All Defendants)

176.    Plaintiffs incorporate by reference the allegations set forth in Paragraphs 1-175 hereinabove.

177.    Plaintiff K.P. asserts this claim under 42 U.S.C. § 1983 for violation of her federally protected constitutional rights under the Equal Protection Clause of the United States Constitution.

178.    All conduct by the District, Tarwater, Roth and Butler alleged herein occurred under color of state law.

179.    Plaintiff has a constitutional right pursuant to the Fourteenth Amendment to the U.S. Constitution to Equal Protection of the laws.

180.    Plaintiff is an individual and member of a protected class under the Fourteenth Amendment.

181.    The course of sexual harassment and misconduct alleged herein was based on Plaintiff's gender and deprived her of the constitutionally and federally protected rights enumerated above.

182.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff has suffered damages, including but not limited to severe emotional distress, psychological injury, and trauma, in addition to the costs associated with past and future medical and psychological treatment.

183.    Due to Defendants' acts and omissions, Plaintiff has been diagnosed with depression, chronic anxiety, and low self-esteem.  These injuries are lasting and potentially life-long.  They will also more likely than not affect Plaintiff's ability to form healthy, lasting romantic relationships.

184.    The individual Defendants' acts and omissions described above were willful, wanton and malicious, and done with reckless indifference to Plaintiff's federally protected rights, entitling Plaintiffs to punitive damages against Defendants Tarwater, Roth and Butler in their individual capacities.

## COUNT V
### (Conspiracy under Section 1985 Against Tarwater, Roth and Butler)

185.     Plaintiffs incorporate by reference the allegations set forth in Paragraphs 1-184 herein above.

186.     Plaintiffs bring this claim under 42 U.S.C § 1985(3) against all Defendants.

187.     As described more fully above, each of the Defendants conspired, directly or indirectly, for the purpose of depriving K.P. and L.M. of their rights under federal law, specifically Title IX, and of depriving K.P. of constitutional rights to due process and equal protection.

188.     In so doing, Defendants took actions in furtherance of this conspiracy, causing injury to Plaintiffs.

189.     The misconduct described herein was undertaken with malice, willfulness, and reckless indifference to the rights of others.

190.     The misconduct described in this count was undertaken pursuant to the policy and practice of the LJSD in the manner described more fully in preceding paragraphs.

191.     Defendants Tarwater, Butler, and Roth acted for the purpose of concealing their individual actions and/or personal involvement in the alleged deprivations, and intentionally abused their positions to further their conspiracy by attempting to "cover up" numerous complaints concerning Tarwater's discriminatory conduct.

192.     Accordingly, each of Defendants Tarwater, Butler, and Roth had an "independent personal stake" in achieving the goals of the conspiracy to deprive Plaintiffs' of their federally protected rights and took actions outside the ordinary course and scope of their employment with the District. As such, the "intercorporate conspiracy" has no application to Plaintiffs' Section 1983 and 1985 claims.

193.    Defendants Tarwater, Butler and Roth each acted to deny Plaintiffs' federally protected rights with malicious intent.

194.    Defendants Tarwater, Butler and Roth each acted with reckless indifference to Plaintiffs' federally protected rights.

195.    In furtherance of the conspiracy, each of the Defendant coconspirators committed overt acts and was an otherwise willful participant in joint activity.

196.    As a direct and proximate result of Defendants' joint activity and unlawful actions, Plaintiffs' rights were violated, and she suffered severe emotional distress and anguish, as is more fully alleged above.

197.    The individual Defendants' acts and omissions described above were willful, wanton and malicious, and done with reckless indifference to Plaintiff's federally protected rights, entitling Plaintiffs to punitive damages against Defendants Tarwater, Roth and Butler in their individual capacities.

## COUNT VI
### (Section 1986 Against Defendant Kellie Roth and/or Kathy Butler)

198.    Plaintiffs incorporate by reference the allegations set forth in Paragraphs 1-197 hereinabove.

199.    Plaintiffs bring this Claim under 42 U.S.C § 1986 against Defendant Kellie Roth and/or Kathy Butler.

200.    Plaintiff's constitutional rights were violated as a direct and proximate result of the conspiracy alleged in Count V.

201.    If Defendants Roth and/or Butler deny they were a participant in the above alleged conspiracy, then, in the alternative, they are liable under 42 U.S.C. § 1986 for failure, neglect, or

37

refusal to exercise their authority to protect the Plaintiffs from suffering the constitutional deprivations alleged herein.

202.    Defendants Roth and Butler had actual knowledge of each co-defendant's unlawful acts taken in furtherance of the above-alleged conspiracy in violation of 42 U.S.C. § 1985.

203.    As President of the Lone Jack School District Board, Defendant Roth had the power to prevent or aid in preventing the commission of the § 1985 conspiracy alleged herein.

204.    As Principal of Lone Jack High School and compliance coordinator, Defendant Butler had the power to prevent or aid in preventing the commission of the § 1985 conspiracy alleged herein.

205.    Defendant Roth and Butler deliberately failed to exercise reasonable diligence to prevent commission of the § 1985 conspiracy.

206.    As a direct and proximate result of Defendant Roth's and Defendant Butler's failures, acts, and omissions, Plaintiffs were deprived of their rights under federal law and the Fourteenth Amendment.

207.    The individual Defendants' acts and omissions described above were willful, wanton and malicious, and done with reckless indifference to Plaintiff's federally protected rights, entitling Plaintiffs to punitive damages against Defendants Roth and/or Butler in their individual capacities.

## COUNT VII
### (Intentional Infliction of Emotional Distress Against Defendant Tarwater)

208.    Plaintiff incorporates by reference the allegations set forth in Paragraphs 1-207 hereinabove.

209. Plaintiff K.P. asserts this claim under the laws of Missouri for the intentional infliction of emotional distress against Defendant Tarwater.

210. The acts and conduct of Defendant Tarwater as set forth above was extreme and outrageous.

211. Defendant Tarwater intended to cause, or was in reckless disregard of the probability that his conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

212. As a direct and proximate result of Defendant Tarwater's wrongful conduct, Plaintiff K.P. has suffered damages, including but not limited to emotional distress, psychological injury, and trauma.

213. Tarwater's conduct as described above was willful, wanton and malicious entitling K.P. to punitive damages against him.

### COUNT VIII
**(Negligent Retention / Supervision against LJSD, Butler and Roth)**

214. Plaintiff incorporates by reference the allegations set forth in Paragraphs 1-213 hereinabove.

215. Plaintiff K.P. asserts this claim under the laws of Missouri for negligent retention / supervision against Defendants LJSD, Butler, and Roth.

216. Upon information and belief, the District maintains insurance that covers common law tort claims, and therefore has waived its immunity under Mo. Rev. Stat. 537.610 for the specific purpose of and to the extent of its insurance coverage.

217. LJSD, Butler and Roth hired and/or retained Tarwater to work at LJHS.

218.    Upon information and belief, Tarwater engaged in similar unlawful behavior before being hired by the LJSD, and LJSD failed to exercise reasonable due diligence when deciding to employ him as principal of LJHS.

219.    Further, LJSD, Butler and Roth had a duty when retaining employees to exercise care used by reasonable and/or careful school districts, high schools or school boards to continually assess an employee's suitability for his position, including but not limited to observing the employee's interaction with students, and collecting, investigating, and responding to any complaints about the employee.

220.    A reasonable and careful school district, high school principal and school board president would have recognized that an employee that conducted himself as Tarwater did posed a danger to the students, employees and the District, and would have terminated Tarwater's employment and otherwise taken action against the dangers he posed.

221.    Prior to and during the time Tarwater was grooming, harassing, preying upon, and abusing his power over K.P., LJSD, Butler and Roth knew or should have known that Tarwater posed an unreasonable risk of harm to female students and that he had a propensity for sexual harassment and misconduct.  Nonetheless, LJSD retained and promoted him as principal and superintendent.

222.    LJSD's, Butler's and Roth's negligence in the retention and/or supervision of Tarwater created a foreseeable risk of harm to students in the school where Tarwater worked, in particular female students including K.P.

223.    As a direct and proximate result of LJSD's, Butler's and Roth's negligent retention and supervision of Tarwater, Plaintiff suffered damages, including but not limited to emotional distress, diagnosable and medically significant psychological injury and trauma.

224.    LJSD's, Butler's and Roth's conduct as described above is willful, wanton and malicious entitling K.P. to punitive damages against them.

## COUNT IX
**(Negligent Inflection of Emotional Distress Against LJSD, Butler and Roth)**

225.    Plaintiff incorporates by reference the allegations set forth in Paragraphs 1-224 hereinabove.

226.    Plaintiff K.P. asserts this claim under the laws of Missouri for negligent infliction of emotional distress against Defendants LJSD, Butler, and Roth.

227.    Upon information and belief, the District maintains insurance that covers common law tort claims, and therefore has waived its immunity under Mo. Rev. Stat. 537.610 for the specific purpose of and to the extent of its insurance coverage.

228.    Defendants owed Plaintiff a legal duty to protect her from the injuries as alleged herein.

229.    Defendants breached of their duty of care in failing to prevent Defendant Tarwater's wrongful conduct.

230.    Defendants knew or should have known that Tarwater's conduct involved an unreasonable risk of Plaintiff causing distress.

231.    As a direct and proximate result of Defendant's negligence, Plaintiff K.P. suffered damages, including but not limited to emotional distress, diagnosable and medically significant psychological injury, and trauma.

WHEREFORE, Plaintiffs pray that this Court conduct a jury trial on their claim, and enter judgment in their favor and against Defendants as follows:

A.    For compensatory damages in whatever amount may be proven at trial under federal and state law;

B.    For punitive damages against Defendants Tarwater, Roth and Butler in an amount to be proven at trial;

C.    For pre- and post-judgment interest as allowed by law;

F.    For reasonable attorneys' fees, including non-taxable litigation expenses;

G.    For costs of suit; and

H.    For such further other relief as the Court may deem just, proper and appropriate.

## JURY DEMAND

K.P. and L.M. hereby request a jury trial on all issues to triable.

Respectfully submitted,

McDOWELL, RICE, SMITH & BUCHANAN, PC

*/s/ Adam J. Gasper*
William C. Odle, MO Bar #38571
Adam J. Gasper, MO Bar #61168
605 W. 47th Street, Suite 350
Kansas City, MO 64112
(816) 753-5400 telephone
(816) 753-9996 facsimile
wodle@mcdowellrice.com
agasper@mcdowellrice.com

ATTORNEYS FOR PLAINTIFFS